CLERK'S OFFICE U.S. DIST. COURT
AT ROANOKE, VA
FILED

NOV 07 2013

JULIA C. DUDLEY, CLERK
BY: _____
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

AVEPOINT, INC. and                          )
AVEPOINT PUBLIC SECTOR, INC.,               )
                                            )
    Plaintiffs,                             )       Civil Action No. 7:13CV00035
                                            )
v.                                          )       **MEMORANDUM OPINION**
                                            )
POWER TOOLS, INC. d/b/a AXCELER             )       By: Hon. Glen E. Conrad
and MICHAEL X. BURNS,                       )       Chief United States District Judge
                                            )
    Defendants.                             )

AvePoint, Inc. and AvePoint Public Sector, Inc. (collectively "AvePoint") filed this action

against Power Tools, Inc. d/b/a Axceler ("Axceler") and Michael X. Burns ("Burns"), asserting

claims for defamation; breach of contract; trademark infringement, false association or false

endorsement, false designation of source or origin, and false advertising under the Lanham Act;

false advertising and unfair competition under Virginia law; and violations of the Virginia

Computer Crimes Act.   The defendants have moved to dismiss the amended complaint, pursuant

to Rule 12(b)(6) of the Federal Rules of Civil Procedure.   For the reasons set forth below, the

defendants' motions will be denied.

## I.    Summary of the Facts

AvePoint, Inc. is an American corporation organized and existing under the laws of

Delaware.   The corporation is a leading provider of infrastructure management and governance

software platforms for Microsoft SharePoint products and technologies.   AvePoint, Inc.'s

products include DocAve, its "flagship award-winning" SharePoint software platform, and other

products including Governance Automation and Compliance Guardian.   (Am. Compl. ¶ 2.)   On

February 26, 2008, the corporation obtained a certificate of registration from the United States Patent and Trademark Office for the word mark "AvePoint."

AvePoint Public Sector, Inc. is an American corporation organized and existing under the laws of Virginia, with its principal place of business in Virginia. The corporation is a wholly owned subsidiary of AvePoint, Inc., which works extensively with customers in every branch of the United States Armed Forces, federal civilian and intelligence agencies, and state and local governments to provide infrastructure management solutions for Microsoft SharePoint products and technologies.

Defendant Axceler, a Delaware corporation headquartered in Massachusetts, is one of AvePoint's primary competitors. Axceler offers competing software for Microsoft SharePoint products and technologies. Defendant Burns is Axceler's Regional Vice President of Sales for Western North America.

In the instant action, AvePoint alleges that Axceler and its agents, including Burns, have engaged in a campaign of making false, defamatory, and deceptive claims and statements regarding AvePoint and its products and services, both in online networking services such as Twitter,[1] and in direct communications with customers and prospective customers. Specifically, AvePoint alleges that Axceler and Burns have attempted to confuse customers into falsely believing: (1) that AvePoint is a Chinese company rather than an American company; (2) that AvePoint's software is not made, developed, or supported in the United States; (3) that AvePoint's software is maintained in India; (4) that Axceler's ControlPoint software is "Microsoft recommended" over AvePoint's DocAve software; (5) that AvePoint's customers are "dumping out of 3 year deals in year 2 to buy Axceler's ControlPoint"; and (6) that Axceler uses its

---

[1] Twitter is a social networking site that enables its users to "tweet" (i.e. send a message) to the users' followers.

maintenance revenue to improve its customers' existing products, whereas AvePoint uses its maintenance revenue to develop new products to which its customers have no access.   (Am. Compl. ¶ 18.)   AvePoint alleges that these statements are false, defamatory, deceptive, and likely to confuse consumers, and that they were designed to influence customers to do business with Axceler instead of AvePoint.

AvePoint further alleges that, to perpetuate the false marketing campaign against AvePoint and to create consumer confusion, Axceler and Burns created an account on LinkedIn[2] for a fictitious AvePoint representative named Jim Chung, using AvePoint's registered mark. AvePoint submitted a copy of Jim Chung's LinkedIn profile as an exhibit to the amended complaint.   On the profile, Jim Chung is identified as a "Software Engineer at AvePoint" located in "Xinjiang, China," who has worked for AvePoint from "December 2011 – Present."   (Am. Compl. Ex. I.)   AvePoint emphasizes that the LinkedIn profile encourages viewers to contact Jim Chung for "business deals," "new ventures," and "consulting offers."   (Id.)   Because Jim Chung is identified as a current AvePoint representative, the plaintiffs allege that consumers and others in the business community have been deceived into believing that Jim Chung can be contacted regarding business deals with AvePoint, new ventures with AvePoint, and consulting related to AvePoint products and services.   The plaintiffs allege that the defendants have profited from the goodwill associated with the AvePoint mark by fielding customer inquiries through the imposter account, and that they have used the account to divert business to Axceler and to otherwise cause competitive harm to AvePoint.

AvePoint claims that evidence of actual confusion as to AvePoint's affiliation, connection, or association with Jim Chung and the fictitious account, and as to the origin or source of

---

[2] LinkedIn is a professional networking website that is utilized "for the purpose of locating, establishing, and maintaining business and customer relationships."   (Am. Comp. ¶ 46.)

commercial activities offered through the account, is reflected in Jim Chung's connection list.

AvePoint alleges that because Axceler used AvePoint's mark in the profile, "AvePoint's current

customers, including Nintex and Aetna[,] have been misled and deceived into believing that this is

a legitimate AvePoint account."   (Am. Compl. ¶ 48.)   Likewise, "numerous AvePoint employees

have been misled and deceived into believing that Jim Chung [is] an AvePoint colleague, and have

connected to this account."   (Id.)

AvePoint further alleges that Burns was directly involved in Axceler's efforts to create the

fictitious LinkedIn profile, and that he has been involved in publicizing the profile.   In November

of 2012, after the profile was created, Burns posted several tweets about Jim Chung on Twitter.

For instance, on November 9, 2012, Burns tweeted: "#Axceler and Jim Chung are gonna rock

Vegas!"   (Am. Compl. ¶ 51.)   On November 14, 2012, during the SharePoint conference in Las

Vegas, Burns tweeted: "Just ran into jim chung from avePoint Good guy."   (Id.)   In response to

Burns' November 9, 2012 Twitter post, Christian Buckley, Axceler's Director of Product

Evangelism, tweeted: "@MICHAELBURNS Free Jimmy! #Axceler."   (Id.)

AvePoint claims that Axceler's deceptive practices reached "new heights (or lows)" on

December 18, 2012, "when Axceler created a fictitious email account and profile to obtain a trial

copy of AvePoint's most recent version of DocAve, DocAve 6."   (Am. Compl. ¶ 54.)   At

16:10:44 on that day, AvePoint received a request for a trial download of DocAve 6 from IP

address 64.17.251.102, which contained the following information:

| | |
|---|---|
| Products: | 1. DocAve v6 for SharePoint 2010 |
| Your Name: | Jill Wagner |
| Company: | Kohl\'s Food Stores |
| Email: | JillRWagner@dayrep.com |
| Country: | United States |
| Phone: | 435-[***-****] |
| Environment: | 2010 |
| Personalized Demo: | No, I don't! |

4

Send Marketing Materials:    DO NOT SEND

(Am. Compl. ¶ 54.)

AvePoint alleges that IP address 64.17.251.102 is not registered to "Jill Wagner" or to

"Kohl\'s Food Stores."   Instead, "[t]he address is registered to Defendant 'POWER-TOOLS-

INC-DBA-Axceler.'"   (Am. Compl. ¶ 55.)   Additionally, AvePoint alleges that the email

extension "@dayrep.com" is not real, and that the email address was created using Fake Mail

Generator™.   (Id.)

AvePoint claims that Axceler acquired a trial copy of DocAve 6 under false pretenses so

that it could examine AvePoint's software for competitive, commercial purposes.   AvePoint

further alleges that Axceler's use of the trial version of the software was in violation of AvePoint's

Website Terms and Conditions, which provide, in pertinent part, as follows:

> By accessing, viewing, or using this Site, you, the User, indicate that you
> understand and intend these Terms and Conditions and Privacy Policy to be the
> legal equivalent of a signed, written contract and equally binding, and that you
> agree to such Terms and Conditions and Privacy Policy.
>
> . . .
>
> 1.   Grant of License.   This Agreement provides you, the User, with a personal,
> revocable, nonexclusive, nontransferable license to use this Site conditioned on
> your continued compliance with the Terms and Conditions of this Agreement.
> Users may access, print and download materials and information on this Site solely
> for personal and noncommercial use, provided that all hard copies contain all
> copyright and other applicable notices contained in such materials and information
> . . . . To seek permission to use materials and information (including screenshots of
> this Site or posting any content from this Site) beyond the scope of the foregoing
> license, please contact AvePoint via postal mail, e-mail or telephone as indicated
> below.   Any rights not expressly granted herein are reserved.
>
> . . .
>
> 11.   Governing Law.   This Agreement will be governed by the laws of the
> Commonwealth of Virginia, without regard to conflict of law rules, and the
> exclusive jurisdiction and venue for any dispute shall be the Commonwealth of
> Virginia.

(Am. Compl. ¶ 56.)

## II.     Procedural History

AvePoint filed the instant action against the defendants on January 24, 2013.   After the defendants moved to dismiss the original complaint, AvePoint was granted leave to file an amended complaint.   In the amended complaint, AvePoint asserts the following claims: defamation (Count I); breach of contract (Count II); trademark infringement (Count III); false association or false endorsement (Count IV); false designation of source or origin (Count V); false advertising (Counts VI and VII); unfair competition (Count VIII); and violations of the Virginia Computer Crimes Act (Count IX).   With the exception of Counts II and IX, the claims are asserted against both defendants.   Counts II and IX are asserted only against Axceler.

The defendants have moved to dismiss the amended complaint for failure to state a claim, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.   The court held a hearing on the motions on July 25, 2013.

## III.    Standard of Review

When deciding a motion to dismiss for failure to state a claim, the court must accept as true all well-pleaded allegations and draw all reasonably factual inferences in the plaintiffs' favor. Vitol, S.A. v. Primerose Shipping Co., 708 F.3d 527, 539 (4th Cir. 2013).   "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of [its] entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."   Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007) (internal citation and quotation marks omitted). To survive dismissal for failure to state a claim, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.'"   Ashcroft v. Iqbal,

6

556 U.S. 662, 678 (2009) (quoting Twombly, 550 U.S. at 570).   "A claim has facial plausibility

when the plaintiff pleads factual content that allows the court to draw the reasonable inference that

the defendant is liable for the misconduct alleged."   Id.   In considering a Rule 12(b)(6) motion,

the court may properly consider exhibits attached to the complaint in addition to the complaint

itself.   Fayetteville Investors v. Commercial Builders, Inc., 936 F.2d 1462, 1465 (4th Cir. 1991).

### IV.   Discussion

The defendants have moved to dismiss all nine counts set forth in the amended complaint

on the ground that, for various reasons, they fail to state a claim upon which relief can be granted.

The court will consider each of the plaintiffs' claims in turn.

### A.   Count I: Defamation

Count I of the amended complaint asserts a claim for defamation.   To state a claim for

defamation under Virginia law,[3] the plaintiffs must show that the defendants (1) published (2) an

actionable statement with (3) the requisite intent.   See Chapin v. Knight-Ridder, Inc., 993 F.2d

1087, 1092 (4th Cir. 1993) (citing Gazette, Inc. v. Harris, 325 S.E.2d 713 (1985)).   "To be

'actionable,' the statement must be not only false, but also defamatory, that is, it must 'tend[ ] so to

harm the reputation of another as to lower him in the estimation of the community or to deter third

persons from associating or dealing with him.'"   Id. (quoting Restatement (Second) of Torts §

559).

Certain statements are considered defamatory per se under Virginia law, including those

which prejudice a plaintiff in its profession or trade.   Fleming v. Moore, 275 S.E.2d 632, 636 (Va.

1981); see also Tronfeld v. Nationwide Mut. Ins. Co., 636 S.E.2d 447, 449-50 (Va. 2006).   For

such statements, Virginia law presumes that the plaintiff suffered actual damage to its reputation

and, therefore, no proof of damages is required.   Fleming, 275 S.E.2d at 636.   "To be actionable

---

[3] The parties agree that Virginia law governs the plaintiffs' claims under state law.

without proof of 'special damages' . . . words must contain an imputation that is 'necessarily hurtful' in its effect upon plaintiff's business and must affect [the plaintiff] in [its] particular trade or occupation." Id. (quoting James v. Haymes, 168 S.E.333, 336 (Va. 1933)).

The Supreme Court of Virginia has made clear that a defamatory charge may be made in direct terms, or "by inference, implication[,] or insinuation." Perk v. Vector Resources Group, 485 S.E.2d 140, 144 (Va. 1997) (internal citation and quotation marks omitted). Thus, a plaintiff "need not show that he was mentioned by name in [a] publication." Gazette, Inc. v. Harris, 325 S.E.2d 713, 738 (Va. 1985). Instead, the plaintiff need only show that the published statement was "of or concerning" the plaintiff. Id. (internal citation and quotation marks omitted). A plaintiff satisfies the "of or concerning" test by showing that the statement "was intended to refer to [the plaintiff] and would be so understood by persons reading it who knew [the plaintiff]." Id.

Although "'pure expressions of opinion'" cannot ordinarily serve as the basis for a defamation claim, "factual statements made to support or justify an opinion can." WJLA-TV v. Levin, 564 S.E.2d 383, 392 (Va. 2002). Accordingly, statements that are verifiably false or contain "provably false factual connotations" may be defamatory. Id. The issue of whether a statement is opinion or fact is determined by the court as a matter of law, as is the issue of whether a statement is defamatory. See Yeagle v. Collegiate Times, 497 S.E.2d 136, 138 (Va. 1998); Chaves v. Johnson, 335 S.E.2d 97, 102 (Va. 1985).

With these principles in mind, the court turns to the statements at issue in this case. AvePoint's claim for defamation is based on the following six statements, or categories of statements, which were made by various employees of Axceler, including Burns:

1.  AvePoint is a Chinese company;

2.  AvePoint's software is not developed, supported, or maintained in the United States;

    3.       AvePoint's software is maintained in India;

    4.       "Axceler ControlPoint [software] is Microsoft recommended over AvePoint['s DocAve software]";

    5.       AvePoint customers are "dumping out of 3 year deals in year 2 to buy Axceler's Controlpoint"; and

    6.       Axceler uses its maintenance revenue to improve its customers' existing product whereas AvePoint uses its maintenance revenue to develop new products to which its customers have no access.

(Am. Compl. ¶ 64.)

The first three categories of statements are derived from Twitter posts by Axceler employees, as well as an October 24, 2012 email documenting a conversation that an Axceler employee had with an AvePoint customer from the federal government sector.   AvePoint alleges that Axceler employees have posted multiple messages on Twitter referring to AvePoint as the "Red Dragon," which has long been associated with the People's Republic of China, and claiming that the SharePoint "Red Dragon" is "MADEINCHINA."   (Am. Compl. ¶ 28; Am. Compl. Ex. F.) Consistent with the Twitter posts, the October 24, 2012 email indicates that an Axceler employee "continue[d] to point out the fact about AvePoint being developed in China and maintained in India."   (Am. Compl. Ex. H.)   AvePoint contends that these statements are provably false, and that they have disparaged AvePoint in its trade and profession.

In moving to dismiss this portion of Count I, Axceler argues that these particular statements are not defamatory as a matter of law.   At this stage of the proceedings, however, the court is unable to agree.   While Axceler may be correct that most Americans no longer "cling to the old notion that . . . Asian-produced and maintained goods are inferior to counterparts made in the United States, [or that] conducting business with Communist-dominated countries is unpatriotic," (Br. in Supp. of Mot. to Dismiss 7), AvePoint specifically alleges that the "source and

9

origin of its business, goods and/or services has a significant impact on its customers' willingness

and/or ability to buy AvePoint software and/or services." (Am. Compl. ¶ 12.) AvePoint

emphasizes that this is especially true with federal government customers, who are required to give

preference to domestic end products, including software. See Xerox Corp. v. United States, 753

F. Supp. 2d 1355, 1358 (Ct. Int'l Trade 2011) ("When purchasing goods for its own use, the

federal government has long had a preference for domestically manufactured products. This

preference was established in 1933 by the Buy American Act (41 U.S.C. §§ 10a-10d) ('BAA'),

which remains in effect today, and has recently been described as 'the immovable object' of U.S.

government procurement law."). AvePoint's argument in this regard is further supported by

representations made by Axceler's own representatives. As John Santarelli tweeted on July 31,

2012:

> Is where your #SharePoint products developed important to you?
> **Government Answer: Absolutely!**
> @Axceler #ControlPoint #MADEINTHEUSA

(Am. Compl. Ex. A.)

AvePoint further alleges that Axceler's false and deceptive statements about the

geographic origin of AvePoint's products and services have caused AvePoint to lose customers.

This allegation is supported by other messages posted on Twitter by Axceler employees, which are

attached as exhibits to the amended complaint. See Am. Compl. Ex. F at 7 ("Ouch . . . Another

#Federal Deployment Finds Out Where the Competition is Developed. #SharePoint

#RedDragon #Governance #FDCCI @Axceler"); Id. at 9 ("The #Red #SharePoint Dragon loses

another limb . . . . Another #Federal Deployment makes the paradigm shift to @Axceler"); Id. at

14 ("Great to see another Marine Corps Group replacing the competition with #ControlPoint

which is developed and supported in the #USA. @Axceler"). On this record, the court cannot

conclude, as a matter of law, that the allegedly false statements regarding the geographic origin of AvePoint's products and services are not actionable. Accordingly, Axceler's motion to dismiss will be denied with respect to this portion of Count I.

The fourth statement at issue – that "Axceler['s] ControlPoint is Microsoft recommended over AvePoint['s software]" – was made by an Axceler representative in an email to a customer. (Am. Compl. Ex. C.) The Axceler representative sent the email after learning that the customer had elected to purchase AvePoint's product. In seeking dismissal of this portion of Count I, Axceler does not dispute that the statement is a representation of fact, as opposed to an opinion. Instead, Axceler argues that the statement is not necessarily harmful, since "[b]oth competitors could have high ratings, with Axceler's simply being higher." (Br. in Supp. of Mot. to Dismiss 8.) This interpretation of the statement, however, fails to construe the facts in the light most favorable to the plaintiffs, as is required at this stage of the proceedings. Applying the proper standard, the court concludes that the statement that Microsoft, the manufacturer of Sharepoint products and technologies, has affirmatively "recommended" that customers buy Axceler's software over AvePoint's software "could prejudice" AvePoint in its business and, thus, that it "support[s] a cause of action for defamation per se under Virginia law." Tronfeld, 636 S.E.2d at 451.

The fifth statement at issue - that "the Evil Avenue's customers are dumping out of 3 year deals in year 2 to buy Axceler's ControlPoint" - was posted by Burns on Twitter. (Am. Compl. Ex. D.) Specifically, Burns stated: "U know things are bad when the Evil Avenue's customers are dumping out of 3 year deals in year 2 to buy Axceler's ControlPoint!" (Id.) In arguing that this statement is not actionable, the defendants first emphasize that the statement did not mention AvePoint by name, and instead referred only to the "Evil Avenue." As set forth above, however,

11

AvePoint need not show that the publication mentioned it by name; it is enough that the publication was "of and concerning" AvePoint. Gazette, Inc., 325 S.E.2d at 738. Construing the allegations in the light most favorable to the plaintiffs, it is plausible that Burns' statement regarding the "Evil Avenue" was intended to refer to AvePoint, which produces and sells DocAve software, and that the statement would be so understood by people reading it who are familiar with AvePoint. See Id.

The court must also reject the defendants' argument that Burns' Twitter post offered only an opinion. Burns' statement that "customers are dumping out of 3 year deals in year 2 to buy Axceler's Controlpoint" does not necessarily depend on his own point of view. Instead, the statement contains a factual assertion that is capable of being proven true or false. See Fuste v. Riverside Healthcare Ass'n, 575 S.E.2d 858, 862 (Va. 2003).

The defendants also argue that the statement is not necessarily prejudicial, since Axceler could simply be offering deals that are too favorable for AvePoint customers to turn down. Considering the statement in its entirety, however, the court is simply unable to conclude, at this stage of the proceedings, that it lacks the necessary defamatory "sting." As set forth above, Burns prefaced the statement by saying that "U know things are bad when . . . ." (Am. Compl. Ex. D.) On this record, the court is of the opinion that the statement supports a plausible claim for defamation per se.

The final statement at issue – that Axceler uses its maintenance revenue to improve its customers' existing product, whereas AvePoint uses its maintenance revenue to develop new products to which its customers have no access – was made to Fairpoint Communications in August 2012. AvePoint alleges that Fairpoint Communications relied on the statement in

12

deciding to purchase products and services from Axceler instead of Avepoint and, thus, that it suffered actual damages as a result of the statement.

In seeking dismissal of this portion of Count I, Axceler argues that the statement is not actionable, since some customers might prefer AvePoint's alleged approach to maintenance fees. Construed in the light most favorable to AvePoint, however, the statement implies that AvePoint is misusing revenue from customers and, thus, could be considered defamatory. Because of this, and because the statement allegedly caused AvePoint to lose a sale to Fairpoint Communications, the court concludes that this statement also supports a plausible claim for relief. For these reasons, the defendants' motions will be denied with respect to Count I.

**B.    Count II: Breach of Contract**

In Count II of the amended complaint, AvePoint asserts a claim for breach of contract against Axceler. Specifically, AvePoint alleges that Axceler breached the Terms and Conditions set forth on AvePoint's website by downloading a trial copy of DocAve 6 for competitive, commercial purposes, and that AvePoint has suffered direct and consequential damages as a result of the breach.

To establish a claim for breach of contract under Virginia law, a plaintiff must prove the following elements: "(1) a legally enforceable obligation of a defendant to a plaintiff; (2) the defendant's violation or breach of that obligation; and (3) injury or damage to the plaintiff caused by the breach of obligation." Filak v. George, 594 S.E.2d 610, 614 (Va. 2004). In order for a contract to arise, the parties must manifest their mutual assent to the contract's terms. Moorman v. Blackstock, Inc., 661 S.E.2d 404, 409 (Va. 2008); Phillips v. Mazyck, 643 S.E.2d 172, 175 (Va. 2007). Assent may be manifested directly, by written or spoken words, or indirectly, through

one's actions or conduct.   See Princess Cruises, Inc. v. General Electric Co., 143 F.3d 828, 834 (4th Cir. 1998).

In moving to dismiss this count, Axceler argues that the breach of contract claim fails to state an entitlement to legal relief, because AvePoint has not alleged sufficient facts to support a plausible allegation that an enforceable contract existed between the two parties.   For the following reasons, however, the court concludes that the allegations in the amended complaint are sufficient to withstand a Rule 12(b)(6) motion.

AvePoint contends that its Website Terms and Conditions bound Axceler to a contractual obligation once Axceler used the site with actual or constructive knowledge of the Terms and Conditions.   The Terms and Conditions provide that "[by] accessing, viewing, or using this Site, you, the User, indicate that you understand and intend these Terms and Conditions . . . to be the legal equivalent of a signed, written contract and equally binding, and that you agree to such Terms and Conditions."   (Am. Compl. Ex. M.)   The Terms and Conditions further provide that "[u]sers may access, print and download materials and information on this Site solely for personal and noncommercial use . . . ."   (Id.)

Courts have labeled the type of agreement that AvePoint seeks to enforce a "browsewrap" agreement.   "Browsewrap agreements are those that purport to bind the users of websites to which the agreements are hyperlinked."   Be In, Inc. v. Google, Inc., No. 12-CV-03373, 2013 U.S. Dist. LEXIS 147047, at *23 (N.D. Cal. Oct. 9, 2013).   As is true in the instant case, "the text of the agreement is [generally] found on a separate webpage hyperlinked to the website the user is accessing."   Id.   A "defining feature" of a browsewrap agreement "is that it does not require a user to manifest assent to the terms and conditions expressly – the user need not sign a document or click on an 'accept' or 'I agree' button."   Southwest Airlines Co. v. BoardFirst, LLC, No.

14

3:06-CV-0891, 2007 U.S. Dist. LEXIS 96230, at *14 (N.D. Tex. Sept. 12, 2007).   "A party

instead gives his assent by using the website."   Id.; see also Hines v. Overstock.com, Inc., 668 F.

Supp. 2d 362, 366 (E.D.N.Y. 2009) (distinguishing "browsewrap" agreements from "clickwrap"

agreements, "in which website users typically click an 'I agree' box after being presented with a

list of terms and conditions of use").

Although neither party has cited case law from the United States Court of Appeals for the

Fourth Circuit addressing the validity of browsewrap agreements, a number of other courts have

been called upon to determine their enforceability.   "Though the outcomes in these cases are

mixed, one general principle that emerges is that the validity of a browsewrap [agreement] turns on

whether a website user has actual or constructive knowledge of a site's terms and conditions prior

to using the site."   Southwest Airlines Co., 2007 U.S. Dist. LEXIS 96230, at *15-16 (citing

cases); see also Van Tassell v. United Mktg. Group, LLC, 795 F. Supp. 2d 770, 790 (N.D. Ill.

2011) ("Because no affirmative action is required by the website to agree to the terms of a contract

other than his or her use of a website, the determination of the validity of a browsewrap contract

depends on whether the user has actual or constructive knowledge of a website's terms and

conditions."); Cvent, Inc. v. Eventbrite, Inc., 739 F. Supp. 2d 927, 937 (E.D. Va. 2010)

(emphasizing that "[m]ost courts" which have considered the validity of a browsewrap agreement

have held that "the website user must have had actual or constructive knowledge of the site's terms

and conditions").

At this stage of the proceedings, the court is constrained to conclude that the facts set forth

in the amended complaint are sufficient to plausibly allege the existence of an enforceable

browsewrap agreement.   Unlike several other cases in which courts have found a plaintiff's

allegations insufficient to survive a motion to dismiss, AvePoint has alleged more than the mere

existence of a link at the bottom of the AvePoint website.   See Cvent, Inc., 739 F. Supp. 2d at 936

(holding that the plaintiff's "bare assertion[ ] that its terms of use were displayed on its website"

was insufficient to establish that the defendants were on actual or constructive notice of those

terms); Be In, Inc., 2013 U.S. Dist. LEXIS 147047, at *33 (holding that the plaintiff failed to

provide allegations from which the court could infer valid contract formation, where the plaintiff

"merely allege[d] the existence of . . . a link [to the website's terms and conditions]").   Instead,

AvePoint cites additional facts to support its claim that Axceler had actual or constructive

knowledge of the Website Terms and Conditions.   Specifically, AvePoint contends that the fact

that Axceler went to the trouble of creating a fictitious profile and email account in order to

download the software suggests that Axceler had knowledge of the Terms and Conditions, and was

aware that they prohibit users from downloading materials for commercial use.   AvePoint also

claims that Axceler has a similar browsewrap agreement on its own website that restricts the use of

downloaded software and, thus, that it should have known that AvePoint's website has similar

terms and conditions.

In light of these additional factual allegations, the court concludes that declaring the

browsewrap agreement unenforceable under Rule 12(b)(6) would be premature, and that a more

appropriate review of the issue may be conducted after AvePoint and Axceler have had an

opportunity to present all relevant evidence.   Likewise, while AvePoint's allegations regarding

damages are arguably conclusory, the court is of the opinion that the amended complaint contains

sufficient factual content to permit the court to reasonably infer that all of the required breach of

contract elements can be met.   Accordingly, AvePoint's motion to dismiss will be denied as to

Count II.

16

## C.   **Count III: Trademark Infringement**

In Count III of its amended complaint, AvePoint asserts a claim for trademark

infringement, under § 32 of the Lanham Act, against both defendants.   This claim is based on the

LinkedIn account that the defendants allegedly created for a fictitious AvePoint representative

using the AvePoint mark.

> Section 32 of the Lanham Act provides, in pertinent part, as follows:
>
> Any person who shall, without the consent of the registrant –
>
> (a) use in commerce any reproduction, counterfeit, copy, or colorable imitation of a
> registered mark in connection with the sale, offering for sale, distribution, or
> advertising of any goods or services on or in connection with such use is likely to
> cause confusion, or to cause mistake, or to deceive . . . shall be liable in a civil
> action by the registrant for the remedies hereinafter provided.

15 U.S.C. § 1114(1)(a).   To prevail on a claim under this statute, a plaintiff must prove the

following elements:

> (1) that it possesses a mark; (2) that the defendant used the mark; (3) that the
> defendant's use of the mark occurred "in commerce"; (4) that the defendant used
> the mark "in connection with the sale, offering for sale, distribution, or advertising"
> of goods or services; and (5) that the defendant used the mark in a manner likely to
> confuse consumers.

People for the Ethical Treatment of Animals v. Doughney, 263 F.3d 359, 364 (4th Cir. 2001)

(hereinafter "PETA").

In this case, the allegations in the amended complaint are clearly sufficient to establish that

AvePoint owns the "AvePoint" mark and that the defendants used it.   In moving to dismiss this

claim, the defendants argue that the allegations are insufficient to show that they used the mark in

commerce, that they used the mark in connection with the sale, offering for sale, distribution, or

advertising of goods or services, or that they used the mark in a manner engendering a likelihood

of confusion.   For the following reasons, however, the court finds the defendants' arguments unpersuasive.

### 1.    Use in commerce

"It is well established that Lanham Act jurisdiction extends to the limit of Congress's power to regulate interstate commerce."   Lobo Enterprises, Inc. v. Tunnel, Inc., 822 F.2d 331, 332 (2d Cir. 1987).   The Lanham Act defines "commerce" to include "all commerce which may lawfully be regulated by Congress."   15 U.S.C. § 1127.   Courts have construed the Act's use "in commerce" requirement broadly to "denote[] Congress's authority under the Commerce Clause rather than an intent to limit the Lanham Act's application to profit making activity."   Planetary Motion, Inc. v. Techsplosion, Inc., 261 F.3d 1188, 1194 (11th Cir. 2001) (internal citation and quotation marks omitted); Bosley Med. Inst., Inc. v. Kremer, 403 F.3d 672, 677 (9th Cir. 2005) ("'Use in commerce' is simply a jurisdictional predicate to any law passed by Congress under the Commerce Clause.").

Because the internet is an "instrumentality of interstate commerce," courts have repeatedly held that the unauthorized use of a trademark on the internet satisfies the "in commerce" requirement.   Utah Lighthouse Ministry v. Found. for Apologetic Info. and Research, 527 F.3d 1045, 1054 (10th Cir. 2008) (labeling the "in commerce" requirement as "merely jurisdictional," and agreeing that, because "the Internet is generally an instrumentality of interstate commerce, . . . the jurisdiction of the Lanham Act constitutionally extends to unauthorized uses of trademarks on the Internet"); see also Planetary Motion, Inc., 261 F.3d at 1195 (holding that "[t]he distribution of [software] over the [i]nternet satisfies the 'use in commerce' jurisdictional predicate"); Brothers of the Wheel M.C. Executive Council, Inc. v. Mollohan, 909 F. Supp. 2d 506, 538 (S.D. W.Va. 2011)

18

(holding that "defendant's internet activity is a use in commerce"); Transamerica Corp. v. Moniker

Online Servs., LLC, 672 F. Supp. 2d 1353, 1362 (S.D. Fla. 2009) (observing that "the use of a

trademark to draw consumers to a particular website not belonging to the trademark holder

constitutes use in commerce under the Lanham Act"); Savannah College of Art & Design, Inc. v.

Houeix, 369 F. Supp. 2d 929, 942 (S.D. Ohio 2004) (holding that defendant's "dissemination of

information over the internet satisfies the 'use in commerce' requirement"); Planned Parenthood

Fed'n of Am., Inc. v. Bucci, No. 97 Civ. 0629, 1997 U.S. Dist. LEXIS 3338, at *11 (S.D.N.Y.

Mar. 24, 1997) (noting that "the nature of the Internet indicates that establishing a typical home

page on the Internet, for access to all users would satisfy the Lanham Act's 'in commerce'

requirement"); Intermatic Inc. v. Toeppen, 947 F. Supp. 1227, 1239-40 (N.D. Ill. 1996)

(emphasizing that "[b]ecause Internet communications transmit instantaneously on a worldwide

basis[,] there is little question that the 'in commerce' requirement would be met in a typical

Internet message").

    Consistent with these decisions, the court concludes that the factual allegations in the

amended complaint are sufficient to satisfy the use in commerce requirement.   According to the

amended complaint, LinkedIn is a website commonly used for advertising and promotion in the

software industry, and for the purpose of locating, establishing, and maintaining business and

customer relationships.   AvePoint alleges that the defendants created an account on the website

for a fictitious AvePoint representative, and that the defendants are utilizing the AvePoint mark to

attract consumers to the online profile, to falsely promote the commercial activities offered

through the profile, and to cause competitive harm to AvePoint.   Assuming the truth of these and

other factual allegations set forth in the amended complaint, the court believes that the plaintiffs

have adequately pled that the defendants used the AvePoint mark in commerce.[4]

> ## 2.   Use in connection with the sale, offering for sale, distribution, or advertising of goods or services

To prevail under § 32 of the Lanham Act, a plaintiffs must also show that the

defendants used the AvePoint mark "in connection with the sale, offering for sale, distribution, or

advertising of any goods or services."   15 U.S.C. § 1114(1)(a).   This is commonly referred to as

the "commercial use requirement."   Utah Lighthouse Ministry, 527 F.3d at 1052; see also Bosley

Med. Inst., Inc., 403 F.3d at 677 ("The question before us, then, boils down to whether

[defendant's] use of Bosley Medical as his domain name was 'in connection with a sale of goods

or services.'   If it was not, then [the defendant's] use was 'noncommerical' and did not violate the

Lanham Act."); Taubman Co. v. Webfeats, 319 F.3d 770, 774 (6th Cir. 2003) ("If [defendant's]

use is commercial, then, and only then, do we analyze his use for a likelihood of confusion.")

In this case, the factual allegations set forth in the amended complaint permit the court to

reasonably infer that the defendants used the AvePoint mark in a manner sufficient to satisfy this

---

[4] Defendant Burns argues that AvePoint is required to establish "use in commerce" as it is defined in 15 U.S.C. § 1127.   Section 1127 provides, in pertinent part, that "'use in commerce' means the bona fide use of a mark in the ordinary course of trade, and not made merely to reserve a right in a mark," and that "a mark shall be deemed to be in use in commerce -- . . . on services when it is used or displayed in the sale or advertising of services and the services are rendered in commerce, or the services are rendered in more than one State or in the United States and a foreign country and the person rendering the services is engaged in commerce in connection with the services."

Courts interpreting § 1127 are divided over whether to apply this 'use in commerce' definition, which is ordinarily used in the trademark registration context, to the context of trademark infringement. See, e.g., Rescuecom Corp. v. Google, Inc., 562 F.3d 123, 139-40 (2d Cir. 2009) (noting, in dicta, that the statute's requirement of "bona fide use" would make "no sense whatsoever" in the infringement context because this would allow bad faith infringers to escape liability); N. Am. Med. Corp. v. Axiom Worldwide, Inc., 522 F.3d 1211, 1220 n.7 (11th Cir. 2008) (citing favorably to "a leading treatise on trademarks," which "notes that § 1127 'defines the kind of 'use' needed to acquire registered trademark rights -- not to infringe them'") (quoting J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 23:11.50 (4th ed. 2003)).   Even if the court assumes, for purposes of the instant motions, that Burns' argument is correct, the court is of the opinion that the allegations in the amended complaint are sufficient to satisfy the requirements of § 1127.

requirement.   According to the amended complaint, the defendants set up the fictitious LinkedIn account to fortify Axceler's position in the marketplace and reap competitive, commercial benefits.   The plaintiffs allege that the defendants used the AvePoint mark to create the false and misleading impression that Jim Chung is an official AvePoint representative, and that the fictitious profile encourages users to contact Jim Chung regarding "business deals" with AvePoint, "new ventures" with AvePoint, and "consulting offers" related to AvePoint products and services. (Am. Compl. ¶ 47.)   The plaintiffs contend that customers and other individuals in the business community who attempt to contact Jim Chung are unwittingly directed, not to an AvePoint representative as the AvePoint mark would indicate, but to AvePoint's primary competitor.   The plaintiffs further allege that the defendants have been able to profit from the goodwill associated with the AvePoint mark by fielding customer inquiries through the imposter account, and that they have used the account to divert business to Axceler and to otherwise cause competitive harm to AvePoint.

In seeking dismissal of the claim for trademark infringement, the defendants attempt to distinguish the fictitious LinkedIn account from the website at issue in PETA.   However, the defendants' reliance on PETA is somewhat misfocused.   In PETA, the Fourth Circuit was presented with claims for trademark infringement and unfair competition that arose from the defendant's creation of a website containing the domain name "peta.org," which promoted ideas that were antithetical to PETA's animal rights agenda.   PETA, 263 F.3d at 362-63.   Although the defendant did not sell or advertise any goods or services on the peta.org website, and the website did not otherwise appear to have a commercial purpose, the Fourth Circuit nonetheless rejected the defendant's argument that he did not use the plaintiff's mark in connection with goods or services:

> To use PETA's Mark "in connection with" goods or services, Doughney need not have actually sold or advertised goods or services on the www.peta.org website.

> Rather, Doughney need only have prevented users from obtaining or using PETA's goods or services, or need only have connected the website to other's goods or services.

Id. at 365.   Since the defendant's use of the plaintiff's mark in the domain name of his website was likely to prevent internet users from reaching PETA's own website, the Fourth Circuit held that the defendant used the plaintiff's mark in connection with the distribution of services.   Id. The Court further held that because the defendant's website provided links to over 30 commercial operations which actually offered goods or services, the defendant's use of the plaintiff's mark was in connection with the sale of goods or services.   Id.

The court, of course, the court is not presented with a website that merely parodies AvePoint or promotes opposing behaviors or ideas.   Instead, the plaintiffs allege that AvePoint and Axceler are direct competitors in the software industry, that the defendants masqueraded as an official AvePoint representative on LinkedIn, and that they used the fictitious LinkedIn profile to divert business to Axceler and advance Axceler's position in the marketplace.   Thus, this case, at least under the facts alleged in the amended complaint, falls not within the ambit of PETA, but within the scope of the more traditional tests for establishing the commercial use of a mark.   See Bosley Med. Institute, Inc., 403 F.3d at 679 (emphasizing that the Lanham Act was "expressly enacted to be applied in commercial contexts," and that "the appropriate inquiry is whether [the defendant] offers competing services to the public") (emphasis in original); Utah Lighthouse Ministry, 527 F.3d at 1053-54 (emphasizing that a defendant in a trademark infringement and unfair competition case "must use the mark in connection with the goods or services of a competing producer").

The court recognizes that the defendants dispute the plaintiffs' allegations regarding LinkedIn and the purposes for which the website's profiles are used.   In seeking dismissal of this count, the defendants argue that the individual profile for Jim Chung is "best described as a resume

for Chung, listing his experience, education and groups/associations," and that the plaintiffs'

allegations to the contrary "def[y] the very organization of LinkedIn."   (Axceler Br. in Supp. of

Mot. to Dismiss at 17, 19.)   Such arguments, however, are unavailing at this stage of the

proceedings.   The plaintiffs' factual allegations, which must be accepted as true, do not support

the notion that the fake LinkedIn account is merely the equivalent of a static paper resume

designed to market an individual's talents to potential employers.   Instead, according to the

amended complaint, the profile belongs to the defendants, and it has been utilized for competitive,

commercial purposes, specifically to profit from AvePoint's goodwill and divert business to

Axceler.   While the defendants may ultimately disprove these allegations on summary judgment

or at trial, the court concludes that they are sufficient to defeat the defendants' motion to dismiss.

See Edwards v. City of Goldsboro, 178 F.3d 231, 243-44 (4th Cir. 1999) ("The purpose of a Rule

12(b)(6) motion is to test the sufficiency of a complaint; 'importantly, [a Rule 12(b)(6) motion]

does not resolve contests surrounding the facts, the merits of a claim, or the applicability of

defenses.'") (quoting Republican Party v. Martin, 980 F.2d 943, 952 (4th Cir. 1992)).

### 3. Likelihood of confusion

The final element of the test for trademark infringement is the likelihood of confusion.

"A likelihood of confusion exists if the defendant's actual practice is likely to produce confusion in

the minds of consumers about the origin of the goods or services in question."   George & Co.,

LLC v. Imagination Entm't Ltd., 575 F.3d 383, 393 (4th Cir. 2009) (internal citation and quotation

marks omitted).   The Fourth Circuit has identified at least nine factors that can be relevant to the

"likelihood of confusion" inquiry:

> (1) the strength or distinctiveness of the plaintiff's mark as actually used in the
> marketplace; (2) the similarity of the two marks to consumers; (3) the similarity of
> goods or services that the marks identify; (4) the similarity of the facilities used by
> the markholders; (5) the similarity of advertising used by the markholders; (6) the

23

defendant's intent; (7) actual confusion; (8) the quality of the defendant's product; and (9) the sophistication of the consuming public.

Id.   The Fourth Circuit has emphasized, however, that "[t]his judicially created list of factors is not intended to be exhaustive or mandatory," and that "not all factors are relevant in every case." Rosetta Stone Ltd. v. Google, Inc., 676 F.3d 144, 154 (4th Cir. 2012) (internal citation and quotation marks omitted) (holding that the district court did not commit reversible error in only addressing three factors on summary judgment).   Of all the factors, "evidence of actual confusion is 'often paramount' in the likelihood of confusion analysis.'"   George & Co., LLC, 575 F.3d at 393.

With these principles in mind, the court concludes that the facts set forth in the amended complaint are sufficient to support the assertion that the defendants used the AvePoint mark in a manner likely to confuse consumers.   AvePoint alleges that it has owned the AvePoint mark for over five years, that the mark is inherently distinctive, and that it has used, and continues to use, the mark in connection with its own goods and services in interstate commerce.   AvePoint further alleges that the defendants used the AvePoint mark with the specific intent to cause confusion as to AvePoint's affiliation with Jim Chung and the commercial services offered through the fake Jim Chung account.   While the defendants may ultimately prove otherwise, the court is convinced that the allegations in the amended complaint plausibly suggest that the defendants acted with the requisite intent.

Additionally, and perhaps most importantly, AvePoint alleges that the defendants' use of the AvePoint mark has resulted in actual confusion:

> [E]vidence of actual confusion is reflected in Jim Chung's connection list which shows actual AvePoint employees and current and potential AvePoint customers who have been confused about AvePoint's affiliation with Axceler's imposter account.   Because Axceler used AvePoint's Mark in its profile, AvePoint's current customers, including Nintex and Aetna have been misled and deceived into

24

> believing that Jim Chung was an AvePoint colleague, and have connected to this
> account.   This confusion as to source or sponsorship by current AvePoint
> employees is equally insidious because those employees unwittingly enabled
> Axceler to access other AvePoint customer and employee contacts – including
> those customer contacts associated with legitimate AvePoint employees' profiles –
> and other competitive business information.

(Am. Compl. ¶ 48.)   While the defendants dispute these allegations, arguing that the LinkedIn

users were merely confused as to whether they knew Jim Chung, the court believes that the

defendants' arguments in this regard are best left for summary judgment.   At this stage of the

proceedings, AvePoint has alleged facts that plausibly suggest that AvePoint customers and other

users connected to the "Jim Chung . . . at AvePoint" account because they were confused and

deceived into believing that the account was for a duly authorized representative of AvePoint, who

could be contacted regarding business deals and new ventures with the company.

Having concluded that AvePoint has alleged facts sufficient to support each element of the

claim for trademark infringement, the court will deny the defendants' motions to dismiss with

respect to Count III.

## D.   Count IV: False Association or False Endorsement

In Count IV of the amended complaint, AvePoint asserts the first of three claims under

Section 43(a)(1) of the Lanham Act.[5]   This particular claim, which is also based on the fictitious

LinkedIn profile, is commonly referred to as a claim for false association or false endorsement.

---

[5] The full text of Section 43(a)(1) provides as follows:

(1) Any person who, on or in connection with any goods or services, or any container for
goods, uses in commerce any word, term, name, symbol, or device, or any combination
thereof, or any false designation of origin, false or misleading description of fact, or false
or misleading representation of fact, which--

(A) is likely to cause confusion, or to cause mistake, or to deceive as to the
affiliation, connection, or association of such person with another person, or as to
the origin, sponsorship, or approval of his or her goods, services, or commercial
activities by another person, or

A cause of action for false association or false endorsement is governed by § 43(a)(1)(A), which provides liability for "false representations concerning the origin, association or endorsement of [one's] goods or services through the wrongful use of another's distinctive mark, name, trade dress or other device." L.S. Heath & Son v. AT & T Info. Sys., Inc., 9 F.3d 561, 575 (7th Cir. 1993).   Applying the plain language of § 43(1)(A), courts have held that "[f]alse endorsement occurs when a person's [or company's] identity is connected with a product or service in such a way that consumers are likely to be misled about the person's [or company's] sponsorship or approval of the product or service." Maremont v. Susan Fredman Design Group, Ltd., 772 F. Supp. 2d 967, 971 (N.D. Ill. 2011) (internal citation omitted).   Courts have also held that "[l]iability for false association may arise where the defendant has used trademarks in a manner likely to cause the public to believe that the defendant is a participant in the trademark holder's authorized sales network." Tinn v. EMM Labs, Inc., Civ. No. 07-963-AC, 2009 U.S. Dist. LEXIS 15753, at *34-35 (D. Ore. Feb. 27, 2009) (internal citation and quotation marks omitted).

In moving to dismiss this claim, the defendants argue that AvePoint has failed to plead sufficient facts to establish the requisite likelihood of confusion as to AvePoint's association with the LinkedIn profile, or the company's sponsorship or approval of it.[6]   Upon review of the

---

> (B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,
>
> shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a)(1).

[6] The defendants also argue that the allegations in the amended complaint are insufficient to establish that they used the AvePoint mark in connection with any goods or services.   For the reasons discussed above, however, the court is unable to agree.

26

amended complaint, however, the court finds the defendants' arguments unpersuasive.  As set

forth above, AvePoint alleges that the defendants masqueraded as an official AvePoint

representative on LinkedIn, and that they promoted services through the account in a manner likely

to cause confusion as to whether such services were offered in connection with, or on behalf of,

AvePoint.  See Am. Compl. ¶ 17 (emphasizing that "consumers and others in the business

community who view his profile are likely to be and have been confused and misled into thinking

that 'Jim Chung' can be contacted regarding: AvePoint career opportunities, new ventures with

AvePoint, business deals with AvePoint and/or expertise, references and consulting related to

AvePoint products and services").  AvePoint further alleges that actual AvePoint customers and

employees connected with the fictitious account, because they were deceived into believing that

Jim Chung is a duly authorized AvePoint representative.  While the defendants emphasize that

the LinkedIn profile "does not contain any statements telling viewers that AvePoint sponsored,

approved of, or endorsed [it]" (Axceler Br. in Supp. of Mot. to Dismiss at 25), the defendants cite

no case law to support the proposition that expressed statements of approval or sponsorship are

required to state a claim for false association or endorsement.  Instead, the statute only requires a

likelihood of confusion as to a party's "affiliation," "connection," "association," "sponsorship," or

"approval."   15 U.S.C. § 1125(a)(1)(A).  At this stage of the proceedings, the court is of the

opinion that the plaintiffs' allegations in support of the claim for false association or endorsement

are sufficient to raise a right to relief above the speculative level.  Accordingly, the defendants'

motions to dismiss will be denied with respect to Count IV.

### E.   Count V: False Designation of Source or Origin

In Count V, AvePoint asserts a claim for false designation of source or origin, pursuant to

27

§ 43(a)(1)(A) of the Lanham Act, against both defendants.   A claim for false designation of source or origin requires proof of the same elements as a claim for trademark infringement. Lamparello, 420 F.3d at 313; see also Hammerhead Entm't, LLC v. Ennis, No. 4:11cv65, 2011 U.S. Dist. LEXIS 78102, at *13 (E.D. Va. July 19, 2011) (citing Lamparello for the proposition that "both trademark infringement claims and false designation of origin claims have the same five elements").   Accordingly, to establish a claim for false designation of source or origin, AvePoint must prove: (1) that it possesses a mark; (2) that the defendants used the mark; (3) that the defendants' use of the mark occurred in commerce; (4) that the defendants used the mark in connection with the sale, offering for sale, distribution, or advertising of goods or services; and (5) that the defendants used the mark in a manner likely to confuse consumers.   Lamparello, 420 F.3d at 313 (citing PETA, 263 F.3d at 364).

To the extent Count V is based on the fictitious LinkedIn account, the court concludes that the defendants' motions to dismiss must be denied.   The court determined above that the allegations regarding the LinkedIn account are sufficient to satisfy the required elements of a trademark infringement action.   Because the same elements apply to the instant claim, the court likewise concludes that those allegations are sufficient to state a claim for false designation of source or origin against the defendants.

In addition to relying on the LinkedIn account to support the claim for false designation, AvePoint alleges that the defendants have attempted to confuse consumers into falsely believing that AvePoint is a Chinese company, and that AvePoint's software is not made, developed, or supported in the United States.   To the extent Count V is based on false statements regarding the geographic origin of AvePoint's own products, which were made on Twitter and in other direct

28

communications with AvePoint customers, the court agrees with the defendants that such statements do not give rise to a claim for false designation under § 43(a)(1)(A).

Unlike § 43(a)(1)(B) of the Lanham Act,[7] which makes it unlawful for a person to use in commerce, in connection with goods and services, any false or misleading description of fact in commercial advertising that "misrepresents the . . . geographic origin of his or her or another person's goods, services, or commercial activities," 15 U.S.C. § 1125(a)(1)(B) (emphasis added), § 43(a)(1)(A) only applies when a person uses in commerce, in connection with goods or services, a false description of fact that is likely to cause confusion as to the "origin, sponsorship, or approval of his or her goods, services, or commercial activities," 15 U.S.C. § 1125(a)(1)(A) (emphasis added).   Because § 43(a)(1)(A), by its plain terms, does not extend to misrepresentations regarding the geographic origin of another person's goods or services, the court agrees with the defendants that statements made on Twitter and in other direct communications with customers, regarding the geographic origin of AvePoint's goods and services, do not provide a basis for relief under this particular statutory provision.

**F.    Count VI: False Advertising under the Lanham Act**

In Count VI, AvePoint asserts a claim against the defendants for false advertising under the Lanham Act.   As set forth above, § 43(a)(1)(B) of the Lanham Act prohibits an individual or entity from making a "false or misleading description of fact, or false or misleading representation of fact, which . . . in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographical origin of his or her or another person's goods, services, or commercial activities."   15 U.S.C. § 1125(a)(1)(B).   A plaintiff asserting a claim for false advertising under this statute must establish: (1) that the defendant made a false or misleading

---

[7] Section 43(a)(1)(B) of the Lanham Act provides a cause of action for false advertising.   A claim for false advertising is separately asserted in Count VI of the amended complaint.

description of fact or representation of fact in a commercial advertisement about his or another's product or service; (2) that the misrepresentation is material, in that it is likely to influence purchasing decisions; (3) that the misrepresentation actually deceives or has the tendency to deceive a substantial segment of its audience; (4) that the defendant placed the false or misleading statement in interstate commerce; and (5) that the plaintiff has been or is likely to be injured as a result of the misrepresentation.   See PBM Prods., LLC v. Mead Johnson & Co., 639 F.3d 111, 120 (4th Cir. 2011).

Although the Fourth Circuit has not defined the term "commercial advertisement," several other circuits have adopted the four-part test initially set forth by the Southern District of New York in Gordon & Breach Science Publishers v. Am. Inst. of Physics, 859 F. Supp. 1521 (S.D.N.Y. 1994).   See Podiatrist Ass'n, Inc. v. La Cruz Azul de Puerto Rico, Inc., 332 F.3d 6, 19 (1st Cir. 2003); Rice v. Fox Broad. Co., 330 F.3d 1170, 1181 (9th Cir. 2003); Proctor & Gamble Co. v. Haugen, 222 F.3d 1262, 1273-74 (10th Cir. 2000); Seven-Up Co. v. Coca-Cola Co., 86 F.3d 1379, 1384 (5th Cir. 1996); but see Fashion Boutique of Short Hills, Inc. v. Fendi USA, Inc., 314 F.3d 48, 56-58 (2d Cir. 2002) (adopting the first, third, and fourth elements of the Gordon & Breach test, but not reaching the question of whether the second element applies).   Likewise, several district courts within this circuit have relied upon the Gordon & Breach test.   See Metro Reg'l Info. Sys. v. Am. Home Realty Network, Inc., No. 12-cv-00954, 2013 U.S. Dist. LEXIS 81030, at *29 (D. Md. June 10, 2013); Design Res., Inc. v. Leather Indus. of Am., 900 F. Supp. 2d 612, 620 (M.D.N.C. 2012); Boykin Anchor Co. v. AT&T Corp., 825 F. Supp. 706, 710-711 (E.D. Va. 2011); Neurotron, Inc. v. Am. Ass'n of Electrodiagnostic Med., 189 F. Supp. 2d 271, 275 (D. Md. 2001).

Under this test, a statement constitutes a "commercial advertisement" only if it is: "(1) commercial speech; (2) by a defendant who is in commercial competition with plaintiff; (3) for the purpose of influencing consumers to buy defendant's goods or services . . . [and] the representations (4) must be disseminated sufficiently to the relevant purchasing public to constitute 'advertising' or 'promotion' within that industry." Neurotron, Inc., 189 F. Supp. 2d at 275 (quoting Gordon & Breach, 859 F. Supp. at 1536).

Applying the elements set forth in PBM Prods., LLC, and the Gordon & Breach test for determining whether a statement constitutes a commercial advertisement, the court concludes that at least some of the allegedly false statements outlined in the amended complaint are plausibly actionable under § 43(a)(1)(B) and, thus, that Count VI is not subject to dismissal.   Specifically, the court concludes that the messages posted on Twitter, which (1) misrepresent the geographic origin of AvePoint's goods or services, and (2) impugn the quality of AvePoint's goods or services, may provide viable grounds for relief under this statute.

With respect to the first category, AvePoint alleges that the defendants have used Twitter to falsely brand AvePoint as a Chinese company and to falsely designate China as the source and origin of AvePoint's products and services.   Examples of such messages include: "@Axceler #ControlPoint #MADEINTHEUSA, The #SharePoint #RedDragon is #MADEINCHINA   Long live #ControlPoint !!!! #ArmyStrong #AUSA2012"; "No better way to end a Thursday than a HILARIOUS e-mail from the competition . . . #desperation #SinkingREDShip #MadeinCHINA #LOSING!"; and "Ouch . . . Another #Federal Deployment Finds Out Where the Competition is Developed.   #SharePoint #RedDragon . . . ."   (Am. Compl. Ex. E.)   AvePoint claims that these statements and factual connotations are provably false because AvePoint is an American company, and because all of its detailed software design, assembly, packaging, and product maintenance are

31

done in the United States. AvePoint further alleges that these false statements regarding the origin of goods and services have caused AvePoint to lose numerous customers, including customers from the federal government sector.

In arguing that the Twitter posts are not actionable under the Lanham Act, the defendants emphasize that none of the posts mentioned AvePoint or its products by name. At this stage of the proceedings, however, the court finds this argument unpersuasive. While the statements at issue do not specifically refer to AvePoint or its DocAve software, AvePoint's claim that the statements are directed at AvePoint and its products and services is plausible. Taking AvePoint's allegations as true, the statements about the "Red Dragon" and "SinkingREDShip" can be fairly understood to refer to AvePoint and its products and services, and Axceler's representatives made the statements with the intent to target AvePoint's customers, by creating the impression that AvePoint is a Chinese company and its products and services are not made, developed, or supported in the United States. Accordingly, the court believes that the plaintiffs have sufficiently alleged that the Twitter posts were directed at AvePoint and its products and services, even though the messages did not specifically refer to them by name. See Time Warner Cable, Inc. v. DIRECTV, Inc., 497 F.3d 144, 162 (2d Cir. 2007) (finding irreparable harm and issuing an injunction where consumers would understand that the ads referred to the plaintiff, even though the ads did not specifically refer to the plaintiff by name); Precision IBC, Inc. v. PCM Capital, LLC, No. 10-00682, 2011 U.S. Dist. LEXIS 131822, at *38 (S.D. Ala. Oct. 17, 2011) (denying defendant's motion to dismiss the plaintiff's false advertising claim, and holding that the plaintiff alleged sufficient facts to establish that the statements at issue were directed at it, even though the statements did not specifically mention the plaintiff by name).

32

At this stage of the proceedings, the court also concludes that AvePoint has alleged sufficient facts to plausibly establish that the Twitter posts constitute commercial speech, and that they were disseminated sufficiently to the relevant purchasing public to constitute "advertising" within that industry.   See Gordon & Breach, 859 F. Supp. at 1536.   AvePoint alleges that Twitter is a commonly-used means of advertising in the software industry, and that the messages were published and republished to hundreds of customers, potential customers, and other members of the Microsoft SharePoint community.   AvePoint further alleges that the Axceler representatives elected to use certain hash tags, such as "#AUSA2012," to link the messages to the United States Army Twitter community and other federal government customers of SharePoint products and/or services.   Based on these allegations, the court concludes that the plaintiffs have adequately asserted that the Twitter messages constitute commercial advertising.

In addition to the messages regarding the geographic origin of AvePoint's products and services, the plaintiffs claim that the defendants have posted messages on Twitter that impugn the quality of AvePoint's products and services.   For instance, the plaintiffs emphasize that, in September 2012, Burns posted a message falsely claiming that AvePoint's "customers are dumping out of 3 year deals in year 2 to buy Axceler's Controlpoint!"   See Am. Compl. Ex. D ("U know things are bad when the Evil Avenue's customers are dumping out of 3 years deals to buy Axceler's Controlpoint!").   The plaintiffs claim that this message misrepresents the quality of AvePoint's goods or services, because it implies that the quality is so poor that customers are ending deals early in order to purchase a competing product.   The plaintiffs further allege that the false statements impugning the quality of AvePoint's products and services have caused damage to AvePoint's business, reputation, and goodwill.   Applying the standards set forth above, the court concludes that such allegations are also sufficient to state a plausible claim for relief under

33

§ 43(a)(1)(B) of the Lanham Act.   Accordingly, the defendants' motions will be denied with respect to Count VI.

### G.     Count VII: False Advertising under Virginia law

Count VII asserts a claim for false advertising under Virginia law.   Virginia Code § 18.2-216 prohibits the use, in any advertisement, of "any promise, assertion, representation or statement of fact which is untrue, deceptive or misleading," if the advertisement is made with the "intent to sell" or "to induce the public in any manner to enter into any obligation."   See Persaud Cos. v. IBCS Group, Inc., 425 F. App'x 223, 227 (4th Cir. 2011).   The Supreme Court of Virginia has held that the statute only applies to "non-oral" advertisements.   See Henry v. R.K. Chevrolet, Inc., 254 S.E.2d 66, 68 (Va. 1979).   Additionally, to recover under the statute, the plaintiff must establish that the advertisement caused "actual injury."   Persaud Cos., 425 F. App'x at 227.

Applying these principles, the court concludes that AvePoint has sufficiently pled its claim for false advertising under Virginia law.   At a minimum, the allegations in the amended complaint regarding the Twitter postings discussed above are sufficient to withstand the defendants' motions to dismiss.   Taking AvePoint's allegations as true, the defendants published false and misleading statements regarding the geographic origin and quality of AvePoint's products with the intent to encourage customers to buy its own products.   While the defendants may ultimately disprove these allegations or provide sufficient evidence to establish that the statements did not constitute advertisements, the court is convinced that the plaintiffs' allegations are sufficient to withstand a motion to dismiss.   Accordingly, the defendants' motions will be denied as to Count VII.

### H.     Count VIII: Unfair Competition under Virginia law

Count VIII of the amended complaint asserts a claim for unfair competition under the common law of Virginia.   The Fourth Circuit has held that "[t]he test for trademark infringement

34

and [false designation of origin] under the Lanham Act is essentially the same as that for common law unfair competition under Virginia law because both address the likelihood of confusion as to the source of the goods or services involved." <u>Lone Star Steakhouse & Saloon, Inc. v. Alpha of Va., Inc.</u>, 43 F.3d 922, 930 n.10 (4th Cir. 1995).  Consequently, "[a plaintiff's] state-law unfair competition claim rises or falls with [its] federal claims of infringement and false designation of origin." <u>Lamparello</u>, 420 F.3d at 312 n.1.

Having concluded that AvePoint's allegations regarding the LinkedIn account adequately state claims for trademark infringement and false designation of origin under the Lanham Act, it follows that the claim for unfair competition under Virginia common law is also sufficient to withstand review under Rule 12(b)(6).  Accordingly, the defendants' motions will be denied with respect to Count VIII.

## I.    <u>Count IX: Liability under the Virginia Computer Crimes Act</u>

In its final count, Avepoint claims that Axceler violated the Virginia Computer Crimes Act ("VCCA") by obtaining a trial copy of AvePoint's DocAve 6 for competitive purposes.   The VCCA provides that "[a]ny person who uses a computer or computer network, without authority and . . . [o]btains property or services by false pretenses . . . is guilty of the crime of computer fraud."  Va. Code § 18.2-152.3.  The Act further provides that "any person whose property or person is injured by reason of a violation of any provision of this article . . . regardless of whether such act is committed with malicious intent may sue therefore and recover for any damages sustained."  Va. Code § 18.2-152.12(A).

Upon review of the amended complaint, the court is constrained to conclude that allegations pled in support of Count IX are sufficient to withstand Axceler's motion to dismiss.  To support this count, AvePoint cites many of the same facts asserted in support of its claim for

breach of contract.   Specifically, AvePoint claims that Axceler used its computer network to download a trial copy of AvePoint's DocAve 6 for competitive purposes, in violation of the Website Terms and Conditions.   AvePoint further alleges that Axceler knew, or should have reasonably known, that the Terms and Conditions only permit users to download information for personal and noncommercial use and, thus, that Axceler was without authority to download the software for competitive purposes.   See Va. Code § 18.2-152.2 (stating that "[a] person is 'without authority' if he knows or reasonably should know that he has no right, agreement, or permission or acts in a manner knowingly exceeding such right").   Likewise, AvePoint claims that Axceler obtained the trial software under false pretenses, specifically by creating a fake profile and email account.   AvePoint further alleges that its software has competitive value and that Axceler's conduct has caused damage to its business.   While some of these particular allegations are arguably conclusory, the court is of the opinion that the amended complaint contains sufficient factual content to state a plausible claim under the VCCA.   Accordingly, Axceler's motion to dismiss will be denied with respect to Count IX.

### Conclusion

For the reasons stated, the defendants' motions to dismiss will be denied.   The Clerk is directed to send certified copies of this memorandum opinion and the accompanying order to all counsel of record.

ENTER: This ___ day of November, 2013.

_____
Chief United States District Judge

36